IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JOSHUA J. SCOLMAN,

                        Plaintiff,                        OPINION AND ORDER

    v.

                                                     17-cv-54-wmc

BRIAN FOSTER, ANTHONY MELI,
CAPTAIN RADTKE, and
PAUL LUDVIGSON,

                        Defendants.

*Pro se* plaintiff Joshua J. Scolman is proceeding on claims that certain employees of the Wisconsin Department of Corrections ("DOC") violated his First Amendment right to possess legal materials and, when he pointed out this violation, retaliated by delaying their return. Before the court is defendants' motion for summary judgment and plaintiff's opposition. (Dkt. ##40, 52.) For the reasons that follow, the court will grant defendants' motion and direct entry of judgment in their favor.

## UNDISPUTED FACTS[1]

### A. The Parties

During the relevant time period, plaintiff Joshua Scolman was an inmate at Waupun

---

[1] Unless otherwise noted, the following facts are deemed material and undisputed. Consistent with its practice, the court has drawn these facts from the parties' proposed findings and the evidence of record, when viewed in a light most favorable to plaintiff. *Miller v. Gonzalez*, 761 F.3d 822, 877 (7th Cir. 2014) ("We must . . . construe the record in the light most favorable to the nonmovant and avoid the temptation to decide which party's version of the facts is more likely true."). In addition, Scolman purports to object to nearly all of defendants' proposed findings on similar grounds, including "unsubstantiated," "overly vague," "argumentative," or inaccurate. (*See* dkt. #54.) As a general matter, Scolman's objections are overruled unless specifically noted in the court's recitation of the facts.

Correctional Institution ("Waupun").  During the times relevant to this suit, defendant Brian Foster was Waupun's Warden, while defendant Anthony Meli was its Security Director, and defendant Paul Ludvigson was a Corrections Program Supervisor in its restrictive housing unit ("RHU").  In addition, defendant Cynthia Radtke was Waupun's Investigations Captain until March of 2016, when she transferred into the role of Administrative Captain.  Defendant Radtke also held the role of Security Threat Group ("STG") Coordinator.

### B.  Scolman's RLUIPA Lawsuit and Transfer to Restrictive Housing

On or about August 9, 2013, Scolman and another prisoner filed a complaint in this court, alleging violations of their rights under the First and Fourteenth Amendments and the Religious Land Use and Institutionalized Persons Act ("RLUIPA").  As that RLUIPA lawsuit proceeded, the parties filed cross motions for summary judgment at the end of 2015.  *See Aiello v. West*, Case No. 13-cv-562, dkts. ##37, 53 (W.D. Wis. 2015).  In particular, Scolman was pursuing First Amendment claims related to prayer service availability, the Seder meal, and the Kosher diet against several defendants, including Waupun Corrections Program Supervisor Ludvigson.  In contrast, Meli, Foster, and Radtke were *not* named as defendants, and they disclaim knowledge of that lawsuit, at least during the time period relevant to this suit.  (Dkt. ##44 at 6; 46 at 4; 47 at 4.)

On February 26, 2016, after he repeatedly punched a correctional sergeant, Scolman was moved to the RHU and placed on temporary lock-up status ("TLU").  A disciplinary conduct report finding Scolman guilty of assault on an employee was issued on March 21, 2016, and Scolman was sentenced to 360 days in restrictive housing.  (Dkt. #43-1 at 3.)

2

When an inmate is placed in restrictive housing, a staff member in general population packs up that inmate's property and sends it to the property department for storage and cataloguing.  Normally, as a security measure, that inmate's paperwork is then set aside and reviewed for any information relevant to the conduct that led to the restrictive housing placement (or any evidence of plans to commit additional violations).  However, because the staff assault incident involving Scolman was referred to the Dodge County Sheriff's Office for criminal prosecution, as the then Waupun Investigations Captain, Radtke avers that Scolman's cell would have instead been "sealed off," so that nothing could be removed until the Sheriff had collected any evidence it needed.  (Dkt. #44 at 5.)

The record does not indicate when the Dodge County Sheriff's Office finished its work, but there is no dispute that Scolman's paperwork was then set aside for Captain Radtke's review.  According to Radtke, an allegation of inmate-on-staff assault also "prompts a thorough investigation."[2]  (Dkt. #44 at 3.)  Based on the declarations of several other inmates, Scolman maintains that this document review process should take *at most* "two (2) weeks."  (Dkt. #55 at 2.)  In contrast, Radtke avers that the time it takes to review an inmate's paperwork depends on the volume of documents, the seriousness of the alleged conduct, the possibility of STG activity, staff availability, and the number of other investigations active at the same time.  Moreover, Radtke recalls that Scolman "had more paperwork than the average inmate," and that he had been "identified by the [DOC] as

[2] Scolman contends that there was no investigation in this case, based on defendants' statement in response to a discovery request for documents related to the staff assault that there "was not a separate investigation into" the incident.  (Dkt. #56-11 at 3.)  While there was no formal, internal DAI investigation in this case, defendants note the conduct report itself is evidence that the incident resulting in Scolman's TLU placement was investigated.  (Dkt. #62 at 3.)

being a confirmed member of a Security Threat Group" and was previously involved in "introducing drugs into the institution and other STG activities." (Dkt. #44 at 4-5.) Warden Foster similarly attests that Scolman "had ties to the White Supremacists." (Dkt. #47 at 3.)

Although there was no policy in place establishing a time limit for the completion of Captain Radtke's review, she generally tried to return an inmate's papers as soon as possible, even if that meant returning the papers piecemeal. (Dkt. #44 at 4.) Between February 29 and March 31, Radtke adds that she also conducted and attended various STG trainings and conducted other staff or inmate investigations. Finally, as noted above, she transferred from the position of Investigations Captain to Administrative Captain during this same time period, a process that included moving offices, learning new duties, and training her replacement.

### C. Scolman's Requests for his Legal Paperwork for an Upcoming Deposition

For whatever reason, Scolman's legal materials had still not been returned on March 10, 2016, when he received notice of a March 31 deposition in his RLUIPA lawsuit. As a result, Scolman submitted an inmate complaint on March 14, stating that he had yet to receive his property after 17 days in restrictive housing and explaining that he needed his religious and legal paperwork for both religious practice *and* to meet a court deadline. Scolman also repeatedly wrote to defendants Foster, Meli, Radtke and Ludvigson about

his property and alleged staff retaliation.[3]

In his March 21 letter to Warden Foster, Scolman specifically noted that he had been without his property for three weeks and that staff was mistreating him. (Dkt. #43-2 at 4-5.) Scolman's March 23 letters to Captain Radtke and Supervisor Ludvigson both stated that he needed his legal materials to prepare for a deposition and his religious materials to practice his religion properly. (Dkt. #43-2 at 10-11.) On March 22 and March 23, Scolman also wrote to Security Director Meli indicating that: he needed his confiscated legal paperwork for two court dates, including an upcoming deposition; he was suffering staff mistreatment; and he was unable to practice his religion without the confiscated religious materials. (Dkt. #43-2 at 6-8.)

Although neither Foster nor Radtke responded, Director Meli informed Scolman in a March 25 response that he would be receiving his property "very soon." (Dkt. #43-2 at 9.) Meli also believes he spoke with Captain Radtke about Scolman's property before responding, learning that her review process was not yet complete. The same day he received Meli's response, Scolman submitted an information request to the property department asking for certain items, including "all legal paperwork." (Dkt. #43-2 at 12.) Also on March 25, a correctional officer dropped off two bags of papers in Scolman's cell. While Scolman signed for them, he did not have the chance to review the contents of the bags before the officer left.

---

[3] Captain Radtke does not recall, and has no record of, receiving any correspondence from Scolman about his legal paperwork. (Dkt. #44 at 7-8.) Similarly, Warden Foster states that he responded to an April 6, 2016, letter from Scolman inquiring about his property, but has no record of receiving any other letters from Scolman about this issue. (Dkt. #47 at 3.)

Unfortunately, when Scolman did review the contents, he discovered that the bags did not contain his legal materials.  Scolman then wrote to Ludvigson and Meli again, stating that he had received "most" of his property but asking for his legal materials, specifically noting that he needed his legal materials for his ongoing lawsuit.  (Dkt. #43-2 at 15-16.)  Ludvigson responded that he would speak to the property officer about Scolman's legal materials.  (Dkt. #43-2 at 11.)  Scolman then withdrew his pending inmate complaint on March 28, because he had "received <u>most</u> of [his] property, so [the complaint examiner could] consider this issue resolved"; he further indicated to the examiner that he would file a separate complaint "on the missing items."  (Dkt. #43-5 at 7.)  Although Scolman disputes its accuracy, an unsigned receipt also indicates that he received additional property items on March 30, including "misc papers/legal paperwork/letters." (Dkt. #43-4 at 1.)

Deposed in his RLUIPA lawsuit the very next day, March 31, 2016, during which Scolman swore that he neither had received, nor had not had the opportunity to review, any of his legal materials.  *Aiello*, No. 13-cv-562-wmc, dkt. #85-1.  After opposing counsel explained that the deposition was not a "memory test" and that Scolman could review her copies of any documents she planned to ask him about, Scolman nevertheless proceeded with the deposition.  *Id.*  He next sent letters to Radke and Foster on April 6, 2016, again asking for his legal paperwork.  (Dkt. #43-2 at 18-19.)  Warden Foster responded that same day, noting that he personally did not have any record of having received other correspondence from Scolman about this issue.  (Dkt. #43-2 at 28.)  Foster then referenced Scolman's March 28 admission that he had received most of his property and directed him

to file a new complaint "[s]hould these issues remain." (Dkt. #43-2 at 28.)

On April 7, Scolman submitted a new inmate complaint stating that although most of his property had been returned on March 26, his legal materials had yet to be. (Dkt. #28-2 at 8.) In particular, Scolman noted that he did not have the papers he needed for his deposition and claimed he still needed his legal materials for his ongoing RLUIPA lawsuit in this court. That complaint was rejected as moot based on the March 28 and March 30 property receipts indicating that his legal materials had been returned, a rejection affirmed by Foster on May 8 over Scolman's appeal in which he again asserted that he had received no legal materials before April 26. (Dkt. #28-2 at 1-6.)

According to Scolman, he did ultimately receive most of his legal paperwork on April 26, when Supervisor Ludvigson brought a "stack" to his cell, and then the rest on or about May 27, 2016. (Dkt. ##1 at 10; 28-2 at 15; 56 at 4.) As a result, Scolman contends that he had to complete, without his legal materials, his response to the defendants' supplemental proposed findings submitted in his RLUIPA lawsuit. The defendants proposed findings were based on Scolman's deposition, and his response is dated April 23 and was docketed on April 28. *See Aiello*, No. 13-cv-562-wmc, dkt. #83 at 3.

### D. Scolman's Claims in his RLUIPA Lawsuit are Dismissed

On May 16, 2016, Scolman filed a motion to strike his deposition in his prior lawsuit in this court, arguing that he was unable to prepare because he did not have access to his legal materials, which would have helped him recall many of the details of his lawsuit. *Aiello,* No. 13-cv-562-wmc, dkt. #84, at 2. This court denied that motion, noting that when Scolman indicated he could not answer a question, "he was not cross-examined about

it," and that Scolman should have been able to discuss his own religious beliefs and practices without the help of his legal materials. *Aiello*, No. 13-cv-562-wmc, dkt. #89 at 2.

On September 14, 2016, the court further denied Scolman's motion for summary judgment, instead finding in defendants' favor, while his co-plaintiff prevailed past summary judgment only with respect to his RLUIPA claim for prospective injunctive relief related to the availability of Shabbat services. *Aiello*, No. 13-cv-562-wmc, dkt. #90 at 2, 12-16, 31. Because Scolman was by then no longer practicing Judaism *and* had stated in his deposition that he was not pursuing a claim related to Shabbat services, the court limited this remaining RLUIPA claim to his co-plaintiff alone. *Id.* at 12 n. 5.


OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted). During summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party; however, this treatment does not extend to inferences supported by only speculation or conjecture. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019). Defendants seek judgment in their favor on the merit of all of plaintiff's claims or, alternatively, for qualified immunity with respect to the claim that he was deprived of his

legal materials.

## I.  First Amendment Claim Related to Access to Legal Materials

Defendants seek summary judgment on plaintiff's First Amendment claim that they deprived him of access to all his legal materials while he was on TLU status between February 27 and approximately May 27, 2016.  At the screening stage, the court analyzed plaintiff's allegations under an access to court theory, concluding he failed to state a claim because he could not show that his litigation efforts in the RLUIPA lawsuit had been hampered.  (Dkt. #12 at 11-13.)  At summary judgment, plaintiff continues to dispute this conclusion, arguing that he lost the chance to pursue a possible claim in his RLUIPA suit for the interruption of weekly Jewish prayer services because he lacked access to his legal materials during "a crucial time" – namely, when he sat for his deposition.  (Dkt. #56 at 4.)  More specifically, plaintiff now maintains that this court erroneously conflated weekend Shabbat services with weekly prayer services, and although he stated in his deposition that he was not joining his co-plaintiff in pursuing a RLUIPA claim for interruption in Shabbat services, he still wished to pursue that claim for interruption of weekly prayer services.  Accordingly, plaintiff argues, he would have been allowed to proceed past summary judgment on this claim.  (Dkt. #56 at 3.)

Even if plaintiff were proceeding on an access to court claim, which the court emphasizes he is not, this argument does not hold water.  Plaintiff still does not explain why his legal materials would have been necessary to answer questions as to his actual religious practices during his deposition.  More to the point, while plaintiff attempts to raise a distinction between Shabbat services and weekly prayer services, he admits no

longer practicing Judaism and has no plans to reconvert.  Accordingly, he could not have proceeded on a RLUIPA claim limited to *prospective* injunctive relief for Jewish services of any kind.  *Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012) (only prospective relief is available under RLUIPA).

With that issue aside, the court did allow plaintiff to proceed past screening on a First Amendment claim for violation of his right to access legal materials -- separate and apart from his constitutional right to access the courts.  As to this claim, defendants contend that the undisputed facts do not implicate plaintiff's First Amendment rights because any deprivation in this case was "a relatively short-term, non content-based disruption."  (Dkt. #41 at 7.)  In support, defendants cite *Sizemore v. Williford*, 829 F.2d 608 (7th Cir. 1987), in which the Seventh Circuit held that allegations that copies of a newspaper "were *permanently* withheld and intentionally *never* delivered" implicated the plaintiff's First Amendment rights, but "merely alleging an isolated delay or some other relatively short-term, non content-based disruption in the delivery of inmate reading materials will not support . . . a cause of action grounded upon the First Amendment."  *Id.* at 610.  However, *Sizemore*'s "narrow holding" does not appear to apply here, as it concerned inconsistent delivery of inmate mail and delays of several days.  *Id.* at 609, 611; *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996) (allegations that mail delivery was delayed for an inordinate amount of time can support a First Amendment claim).  In contrast, plaintiff's version is that defendants specifically withheld his legal materials for at least two months without justification *for the purpose* of thwarting his pursuit of a lawsuit, suggesting the possibility of a content-based restriction as applied.  Thus, the court cannot

conclude that plaintiff's access to legal materials claim is wholly foreclosed by *Sizemore*.

Even if plaintiff's First Amendment rights have been implicated by Waupun's delayed paperwork review process, however, his claim still cannot proceed past summary judgment. A prison's restriction on an inmate's speech may be upheld under the First Amendment if it is reasonably related to a legitimate penological interest. *Turner v. Safley*, 482 U.S. 78, 89 (1987); *see Monroe v. Beard*, 536 F.3d 198, 207 (3d Cir. 2008) ("We evaluate prison regulations alleged to violate an inmate's First Amendment right to possess publications and legal materials under the 'reasonableness' test set forth in" *Turner*.). In determining whether a reasonable relationship exists, the Supreme Court usually considers four factors: (1) whether there is a "valid, rational connection" between the restriction and a legitimate governmental interest; (2) whether the prisoner retains alternatives for exercising the right; (3) what impact an accommodation of the right will have on prison administration; and (4) whether there are other obvious, simple ways that prison officials can achieve the same goals without encroaching on the right. *Turner*, 482 U.S. at 89-90. In weighing these factors, the court "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

Assuming there was no meaningful way for plaintiff, or any inmate, to exercise his rights while his legal materials were under review -- such as accessing related materials in the law library -- the remaining factors favor defendants. *See Overton*, 539 U.S. at 135 (a showing that no alternative means existed is not "conclusive"). To begin, safety and

11

security are unquestionably legitimate penological objectives. *Id.* at 133. Moreover, prison officials have a compelling interest in implementing policies designed to combat the threat to institutional security posed by organized gang activity. *Rios v. Lane,* 812 F.2d 1032, 1037 (7th Cir. 1987); *George v. Smith*, 467 F. Supp. 2d 906, 920 (W.D. Wis. 2006) (same). Here, there is no dispute that plaintiff's paperwork was confiscated and reviewed in the wake of his serious assault of a guard.

Although plaintiff maintains that the assault was not related to any STG activity, Scolman does not rebut Warden Foster's and Captain Radtke's assertions that he was *identified* as having historical ties to white supremacist groups. In light of this history, plaintiff's assaultive conduct certainly gave rise to serious institutional security and safety concerns, including the possibility of future, planned rule violations, which defendants were entitled to investigate fully. The fact that no formal DAI investigation followed the investigation that resulted in plaintiff's conduct report is insufficient grounds for a reasonable juror to find defendants had no legitimate reason to retain and review plaintiff's paperwork.

That said, plaintiff's point of contention is not simply that his paperwork was confiscated, but rather that it included legal materials and the review took longer than two weeks. Plaintiff contends in particular that proof of other inmates' property being returned much more quickly demonstrates that the delay in his case could not have been tied to a legitimate interest, even without accounting for the amount of property confiscated or the specific circumstances surrounding those other confiscations. But there was no policy *requiring* Radtke to complete her review within a certain amount of time, and plaintiff's

12

assertion that such a policy *should* exist does not create a material dispute as to whether requiring paperwork review is an exaggerated response to defendants' legitimate penological concerns. *See Caldwell v. Miller*, 790 F.2d 589, 599-600 (7th Cir. 1986) (the court must defer to the judgment of prison officials unless the inmate can demonstrate that prison officials have exaggerated their response to prison concerns). Indeed, even if such a policy existed, it would not be a basis for finding a constitutional violation by itself.

Moreover, plaintiff does not present evidence calling into question defendants' proffered reasons for the review of plaintiff's materials taking longer than usual, including the primacy of Dodge County's investigation, the seriousness of plaintiff's rule violation, the voluminous amount of plaintiff's paperwork (organized though it may have been), Radtke's competing responsibilities through the end of March, and the number of other active reviews. Although plaintiff speculates that someone else could have stepped in and completed his paperwork review sooner, or that Radtke could have at least sorted out, reviewed and returned his legal work on a more expedited basis, either is just that: speculation, rather than a reasonable inference that Radtke held plaintiff's documents for review any longer than necessary for her to complete a thorough review for security reasons. *Cf. Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job.").

In sum, plaintiff may well *believe* that the review of his paperwork took too long, particularly with respect to any legal materials, but he has come forward with no admissible evidence permitting a reasonable juror to find that defendants' concern for safety and security -- and specifically thwarting STG activity -- was not legitimately and honestly held,

13

nor that the careful review of those materials was not rationally related to those goals. Thus, the first *Turner* factor, which weighs particularly heavily in the balance, supports defendants. *See Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010) ("The four factors are all important, but the first one can act as a threshold factor regardless which way it cuts.").

The remaining third and fourth *Turner* factors favor defendants as well. As for the third factor, accommodating a request like plaintiff's for the return of legal materials *before* they were thoroughly reviewed could well threaten orderly prison administration, in that planned illegal conduct, perhaps even future STG conduct, as well as evidence relevant to the specific conduct at issue, could well go unnoticed. Moreover, absent some evidence to the contrary, mere assertion that a review of plaintiff's confiscated materials should take precedent over others' or over Captain Radtke's other obligations is not enough to create a disputed issue of material fact. Finally, simply because no such evidence was ultimately found in reviewing plaintiff's legal paperwork would not allow a reasonable juror to infer that the review process lacked a legitimate basis or purpose.

As for the fourth *Turner* factor, defendants argue that there is no "simple substitute" for paperwork review in protecting the prison's security interest. (Dkt. #41 at 14.) Plaintiff reasonably responds that Radtke could have reviewed legal material first. In fact, as plaintiff notes, he sent letters to defendants in March and April asking for the return of his property, including his legal paperwork, including to Radtke. (Dkt. #43-2 at 4-19.) But as defendants note, although plaintiff often referenced his pending litigation and the need for his legal materials, he also pressed for the return of his religious materials and

14

other personal effects.  While the fourth *Turner* factor is arguably a closer call for this reason, plaintiff has not proffered any evidence indicating that it would have been possible for Radtke to accommodate a request for priority without compromising the integrity of her review or other job obligations as she asserts.  Even if this were not so, plaintiff ignores his own decision to withdraw his original inmate complaint regarding the return of his property, indicating that it had now been returned.  Regardless of plaintiff's change of heart and renewal of his complaint, defendants cannot be faulted for not making completion of any review a priority after this mixed messaging.  On balance, therefore, this factor also cuts in favor of defendants as well.

In sum, the court finds that plaintiff has failed to establish a genuine issue of material fact as to whether reviewing his legal materials was reasonably related to the legitimate penological interests of maintaining safety and security, particularly curbing possible STG activity.  Even if it were otherwise, absent a definitive ruling as to the time by which legal materials *must* be returned -- and plaintiff points to none -- plaintiff would not be entitled to monetary relief in the face of defendants' assertion of qualified immunity. *See, e.g., Mullenix v. Luna*, 577 U.S. 7, 11-12 (2015) ("For a right to be clearly established . . . existing precedent must have placed the statutory or constitutional question beyond debate.").  As a result, plaintiff cannot proceed past summary judgment on this claim, and it is unnecessary to address the defendants' remaining argument related

15

to personal involvement.[4]

## II. First Amendment Retaliation Claim

Defendants also seek summary judgment on plaintiff's retaliation claim. "An act taken in retaliation for the exercise of a constitutionally protected right violates the Constitution." *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000). To prove a retaliation claim under the First Amendment, plaintiff must show that: (1) he was engaged in a constitutionally protected activity; (2) he suffered a deprivation that would likely deter a person from engaging in the protected activity in the future; and (3) the protected activity was a motivating factor in defendants' decision to take retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (citing *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)). Once a plaintiff produces evidence showing each of those elements, the burden shifts to the defendant to show "that the harm would have occurred anyway -- that is, even if there had not been a violation of the First Amendment -- and thus that the violation had not been a 'but for' cause of the harm, for which he is seeking redress." *See Greene v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011). In other words, an otherwise meritorious retaliation claim fails if a defendant's actions were supported by a legitimate reason. *Brown v. Phillips*, 801 F.3d 849, 855 (7th Cir. 2015).

---

[4] This is not to preclude the possibility of monetary damages in a First Amendment claim where a plaintiff had actually apprised defendant of the specific legal documents taken, how they could be timely culled *and* the likely harm that would result if not promptly returned. Of course, in such a case (where, unlike here, a plaintiff would likely be able to demonstrate actual injury resulting from the failure to return legal materials timely), the more obvious, viable claim would be for a denial of access to courts.

Defendants focus on the motivating factor element, noting that only Corrections Program Supervisor Ludvigson was a defendant in plaintiff's prior lawsuit.  However, the fact that plaintiff was not also suing defendants Meli, Radtke, and Foster does not mean that they could not have retaliated against him for his previous litigation.  What ultimately dooms plaintiff's retaliation claim is the lack of evidence from which a reasonable trier could infer that any defendant's delay in returning of legal materials was *motivated* by his having brought the RLUIPA lawsuit.

To begin, plaintiff emphasizes that he repeatedly told defendants in letters that he needed his legal materials to pursue that case.  Even assuming a jury could reasonably infer defendants received and read all of plaintiff's letters, simply knowing about a lawsuit is an insufficient basis for concluding that defendants' conduct was motivated by retaliatory intent.  *See Healy v. City of Chicago*, 450 F.3d 732, 741 (7th Cir. 2006) (mere knowledge that someone has engaged in protected speech does not permit an inference that an adverse action occurred because of this knowledge).  In the case of Warden Foster in particular, any such link would be especially tenuous as plaintiff makes only a passing reference to a "civil suit[] against D.O.C. staff" in his April letter, a reference that does not even make clear which institution is involved in the lawsuit.  (Dkt. #43-2 at 19.)  Moreover, although plaintiff again references his lawsuit in his May 8 letter to Warden Foster, plaintiff did so in the context of requesting a transfer, and *after* (1) he claims most of his legal paperwork was returned, (2) he had been deposed, and (3) had submitted his last responsive filing in the RLUIPA case.  (Dkt. #43-2 at 2.)

17

While plaintiff included more details in his March letters to defendants Meli and Ludvigson, their responses evidence inquiry and problem solving, not a retaliatory intent. Meli specifically recalls reaching out to Radtke before responding on March 25 that plaintiff would soon receive his property, and plaintiff acknowledges that two bags of paperwork were returned that day. (Dkt. #43-2 at 9; 43-4 at 3-4.) And while plaintiff's March 23 and 25 letters to defendant Ludvigson reference the March 31 deposition scheduled in the RLUIPA lawsuit, Ludvigson responded on March 29 that he would check on plaintiff's legal paperwork *and* the March 30 property receipt indicates that at least some of those materials were returned. (Dkt. ## 43-2 at 11; 43-4 at 1.) Moreover, the record contains no subsequent letters to Ludvigson alerting him to any ongoing issue. To the contrary, plaintiff concedes that after Ludvigson proactively followed up *with him* on April 22 regarding his legal materials, and when plaintiff responded that he still did not have those materials, Ludvigson again promised to look into the matter and brought plaintiff a "stack" of legal papers on April 26. (Dkt. #56 at 4.)

Accordingly, although plaintiff emphasizes that his legal materials were not in fact returned until late April and late May, and faults the other three defendants for allegedly not pressing Radtke to complete her review more quickly, nothing in the responses of defendants Foster, Meli or Ludvigson allows for a reasonable inference of intent on their part to stymie plaintiff's litigation efforts. At worst, they suggest only reasonable deference to the ongoing review process that was plainly *Radtke's* responsibility. *Cf. Burks*, 555 F.3d at 595 ("Public officials do not have a free-floating obligation to put things to rights"). Plaintiff's personal beliefs and speculation to the contrary are insufficient to prove his

18

claim.[5]  *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2007); *see Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) (Rule 56 "demands something more specific than the bald assertion of the general truth of a particular matter[.]").

This leaves the claim of retaliation against defendant Radtke, who admittedly presents a closer call.  To buttress his claim, plaintiff relies heavily on suspicious timing, claiming that most of his legal materials were "coincidental[ly]" returned to him close in time after summary judgment briefing was complete in his RLUIPA case.  (Dkt. #53 at 6-7.)  Notably, however, his legal materials were originally confiscated because he assaulted a guard, *not* when he filed his prior lawsuit approximately three years earlier.  Still, once confiscated, most of plaintiff's legal materials were kept until April 26, nearly a month after his deposition, and three days after he completed his response to supplemental proposed findings of fact based on that deposition.  Moreover, "suspicious timing may permit a plaintiff to survive summary judgment if there is other evidence that supports the inference

---

[5] In his opposition brief, plaintiff claims that he need do no more than allege that there was retaliation to create a genuine dispute of fact.  (Dkt. #53 at 7.)  However, the cases he cites do not support that proposition; rather than speak at such a level of generality, each involves more specific factual allegations than in this case or fall outside the summary judgment context altogether.  *See Hines v. Gomez*, 108 F.3d 265, 268 (9th Cir. 1997) (sufficient evidence to support jury verdict of retaliation included testimony from officials and guards, and plaintiff); *Black v. Lane*, 22 F.3d 1395, 1399 (7th Cir. 1994) (to survive a motion to dismiss, plaintiff need only allege a chronology of events from which retaliation may be inferred); *Hines v. Gomez*, 853 F. Supp. 329, 332-33 (N.D. Cal. 1994) (plaintiff's undisputed denial of committing the acts that were the basis of the retaliatory disciplinary reports, coupled with the close timing of filing the reports, show retaliatory motive); *Dillon v. Murray*, 853 F. Supp. 199, 201-04 (W.D. Va. 1994) (genuine issue of material fact existed where defendant, after discovering that the inmate plaintiff intended to file a lawsuit against him, allegedly thwarted plaintiff's attempts to contact a lawyer, made threatening statements to plaintiff and attempted to persuade plaintiff to drop him from the lawsuit before filing a complaint against plaintiff).

of a causal link."[6]  *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005).[7]

As noted, however, plaintiff has *not* established a genuine, material dispute of fact with respect to defendants' proffered reasons for the delay in returning his legal materials. The only other evidence is arguably plaintiff's March 23 and April 6 letters to Radtke referencing his RLUIPA case, to which she did not respond and claims not to have even received.  The March 23 letter notes plaintiff's upcoming March 31 deposition, but the record does not support plaintiff's asserted causal link between Radtke's return of some of his legal materials on April 26 and the conclusion of summary judgment briefing in his RLUIPA case.  Nor is there any indication that Radtke knew plaintiff was preparing any additional filings, had submitted his April 23 response, or even that summary judgment briefing had concluded.  Accordingly, plaintiff has not established a chronology of events or constructed a "mosaic of circumstantial evidence" that would allow a reasonable jury to infer that Radtke deliberately prolonged her review of plaintiff's paperwork *because* he was pursuing an unrelated lawsuit, as opposed to being unable to complete the review any

---

[6] Plaintiff relies on *Cain v. Lane*, 857 F.2d 1139 (7th Cir. 1998) for the proposition that allegations of suspicious timing alone can defeat summary judgment.  (Dkt. #53 at 7.)  In that case, however, the Seventh Circuit held only that a prisoner "must allege a chronology of events from which retaliation may plausibly be inferred" to *state a cause of action* for retaliatory treatment.  *Cain*, 857 F.2d at 1143 n. 6.  Having found that the plaintiff's complaint had stated such a claim, the Seventh Circuit reversed and remanded for further proceedings on the issue, which the district court had failed to address.  *Id.* at 1140-41.  The *Cain* court did not, however, opine on whether that plaintiff could survive summary judgment with respect to his retaliation claim based on timing alone.

[7] In reply, defendants argue that the timing could not be reasonably deemed suspicious because plaintiff filed his response on April 28, two days after most of his legal paperwork was returned. (Dkt. #62 at 5.)  However, plaintiff's response is dated April 23, and his mailing envelope is postmarked April 26.  *See Aiello*, No. 13-cv-562-wmc, dkt. #83-1.  Thus, the court will infer for purposes of summary judgment that plaintiff prepared his response without his legal materials.

sooner for some combination of legitimate and largely undisputed reasons.  *See Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015); *see also Colman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) ("mosaic" evidence can include suspicious timing, ambiguous statements, verbal or written, and other bits and pieces from which an inference of retaliatory intent might be drawn).  Finally, even if plaintiff had shifted the burden to defendants, Radtke's paperwork review was supported by the legitimate, unrefuted reasons discussed above.  Accordingly, the court finds that defendants are entitled to summary judgment on this claim as well.

ORDER

IT IS ORDERED that:

1)  Defendants' motion for summary judgment (dkt. #40) is GRANTED.

2)  Plaintiff's motion in opposition to summary judgment (dkt. #52) is DENIED.

3)  The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 1st day of December, 2020.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge